Filed 11/24/25 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| STATE WATER RESOURCES CONTROL BOARD,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF KINGS COUNTY,<br><br>    Respondent;<br><br>KINGS COUNTY FARM BUREAU et al.,<br><br>    Real Parties in Interest. | F088909<br><br>(Kings Super. Ct. No. 24CU0198)<br><br><br>**ORDER MODIFYING OPINION**<br>[NO CHANGE IN JUDGMENT] |

       This court has received and considered the State Water Resources Control Board's request to modify the opinion to correct typos and clarify certain technical concepts. We agree with the request. It is ordered that the published opinion filed herein on October 29, 2025, be modified as follows:

1. In the middle of the last paragraph on page 4, "The second point, in 2020, considered whether those local agencies had adopted groundwater plans for high-priority basins. (§ 10735.2, subd. (a)(2).)" is deleted and the following is inserted in its place:

> The second point, in 2020, considered whether those local agencies had adopted groundwater plans for high- and medium-priority critically overdrafted basins. (§ 10735.2, subd. (a)(2).)

2. The last sentence on page 4, "The next intervention points, in 2022 and 2025, provided similar checks for medium-priority basins.  (§ 10735.2, subd. (a)(4), (5).)" is deleted and the following sentence inserted in its place:

> The next intervention points, in 2022 and 2025, provided similar checks for other high- and medium-priority basins.  (§ 10735.2, subd. (a)(4), (5).)

3. On page 6, the first sentence of the third full paragraph, "The Tulare subbasin is a high-priority basin under the Act" is deleted and the following sentence is inserted in its place:

> The Tulare subbasin is a high-priority, critically overdrafted basin under the Act.

4. In the first sentence of the last paragraph on page 37 beginning "The fees authorized under section 1529.5," "11735" is replaced with "10735" so the sentence reads:

> The fees authorized under section 1529.5 are themselves adopted "pursuant to Section 1530 to recover costs incurred in administering Chapter 11 (commencing with Section 10735)."

5. In the first sentence of the first full paragraph on page 39 beginning "For its part, the Water Code provides," "11735" is replaced with "10735" so the sentence reads:

> For its part, the Water Code provides review procedures for "any decision or order issued under" sections 1529.5, 1530, and 10735 et seq., among others.  (§ 1120.)

Except for the modifications set forth, the opinion previously filed remains unchanged.  These modifications do not effect a change in the judgment.

HILL, P. J.

WE CONCUR:


DETJEN, J.


FAIN, J.*

---

\*      Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE WATER RESOURCES CONTROL BOARD, | F088909 |
| Petitioner, | (Super. Ct. No. 24CU0198) |
| v. | |
| THE SUPERIOR COURT OF KINGS COUNTY, | **OPINION** |
| Respondent; | |
| KINGS COUNTY FARM BUREAU et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; Petition for Writ of Mandate. Kathy Ciuffini, Judge.

Rob Bonta, Attorney General, Tracy L. Winsor, Assistant Attorney General, Sierra S. Arballo, Margaret V. Tides, Kate D. Fritz, and Lauren Ashley Week, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Paris Kincaid Wasiewski, Valerie C. Kincaid, Timothy J. Wasiewski, and Jonathan R. Marz for Real Parties in Interest.

-ooOoo-

This is the first of two related proceedings arising from the same underlying case. In this proceeding, we consider whether the trial court correctly denied the State Water Resources Control Board's (the State Board's) demurrer to a writ of mandate and complaint filed by Kings County Farm Bureau, Helen Sullivan, and Julie Martella (collectively, the Farm Bureau). In the related proceeding, we consider whether the trial court correctly issued a preliminary injunction against the State Board.

The core concern underlying the litigation is groundwater drawn from the Tulare Lake groundwater subbasin (Tulare subbasin). In 2014, California passed a significant new set of laws known as the Sustainable Groundwater Management Act (the Act) (Wat. Code, § 10720 et seq.).[1] The Act regulates California's groundwater by identifying its most impacted basins, mandating local agencies govern those basins, requiring those agencies to submit sustainable use plans for state approval, and allowing for state intervention if needed.

In the Tulare subbasin, the State Board is attempting to implement statutorily required monitoring, reporting, and fee provisions triggered when state intervention results in a basin being designated as probationary. The Farm Bureau contends the State Board is exceeding its authority and filed a writ of mandate and complaint to stop the State Board's conduct. The State Board currently contends the claims in the complaint are improper but has yet to respond to the writ of mandate. At this stage of the proceedings, the trial court has determined that the Farm Bureau can proceed on the claims raised in its complaint and has imposed a preliminary injunction barring the State Board from, among other things, taking any action related to the probationary designation based partly on the writ claims and partly on the complaint claims. These rulings have effectively halted the State Board's plans.

---

[1] Undesignated statutory references are to the Water Code.

2.

The present petition for writ of mandate was filed after the trial court denied the State Board's demurrer to those claims arising as part of the complaint portion of the Farm Bureau's writ of mandate and complaint. This court previously granted an order to show cause and now issues an order on the petition. In this opinion, we conclude the trial court erred in overruling the State Board's demurrer. For the reasons set forth below, we issue a writ of mandate ordering the trial court to vacate its order overruling the demurrer and enter a new order granting the demurrer.

## OVERVIEW OF THE ACT

The Act essentially mandates locally developed and managed plans for sustainably using over-drafted groundwater basins. Under the terms of the Act, certain prioritized groundwater basins "must be managed under a new groundwater sustainability plan, or a coordinated set of plans" (groundwater plans). (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 840.) "Where groundwater … plans are required, one or more local groundwater sustainability agencies must be formed to cover the basin and prepare and implement the applicable groundwater … plans." (*Id.* at p. 841.) These groundwater plans are then "reviewed by the [Department of Water Resources] to ensure that over a period of 20 years, 'sustainable groundwater management' is achieved." (*Ibid.*)

At the local level, the Act grants local groundwater sustainability agencies (groundwater agencies) with "a number of powers, including the power to perform any act necessary to carry out" the Act's purposes, along with authority "to impose fees on groundwater extraction to fund the costs" of the sustainability programs, groundwater management, investigations, and enforcement. (*Mojave Pistachios, LLC v. Superior Court* (2024) 99 Cal.App.5th 605, 616 (*Mojave Pistachios*).) All of these powers are designed to support the adopted groundwater plans, which are essentially a complex analysis of the relevant basin along with, among other things, measurable objectives and interim milestones, "to achieve the sustainability goal in the basin." (§ 10727.2,

3.

subd. (b).)  The sustainability goal is another complex concept that seeks to determine the annual amount of water that can be extracted from the groundwater basin over a 50-year time period without undesirable results, such as chronic lowering of groundwater levels, significant and unreasonable reduction of groundwater storage, and significant and unreasonable land subsidence, among others.  (See § 10721, subds. (r), (v), (w), (x).)  The groundwater plans can include such actions as the monitoring and management of groundwater levels, quality, and land subsidence, as well as mitigation of overdraft and groundwater recharging.  (§ 10727.2, subd. (d).)

A cornerstone of the Act "is a transfer of responsibility for groundwater management from the state to local jurisdictions when possible."  (*Environmental Law Foundation v. State Water Resources Control Bd.* (2018) 26 Cal.App.5th 844, 863.)  Thus, the Act generally requires actions by local groundwater agencies, which are then subject to evaluation and assessment by the state through the Department of Water Resources (the Department).  (§ 10733.)  However, if certain actions are not taken, the adopted groundwater plans are deemed inadequate, or the groundwater plans are not being implemented in a manner that will meet the sustainability goal, the State Board may intervene at one of several intervention points and designate the basin as a probationary basin.  (§ 10735.2.)

Notably, the Act is generally structured as a long-term process.  Initially enacted in 2014, the Act's intervention points were spread over several years.  The first intervention point, in 2017, considered whether local groundwater agencies had been appropriately formed.  (§ 10735.2, subd. (a)(1).)  The second point, in 2020, considered whether those local agencies had adopted groundwater plans for high-priority basins.  (§ 10735.2, subd. (a)(2).)  This intervention point also considered whether, at that point or later, those plans were adequate and implemented in a manner that would likely achieve the sustainability goal.  (§ 10735.2, subd. (a)(3).)  The next intervention points, in 2022 and 2025, provided similar checks for medium-priority basins.  (§ 10735.2, subd. (a)(4), (5).)

4.

In addition to the multiple intervention points spread over multiple years, the Act generally takes a long-term approach to reaching sustainability, specifically stating the groundwater plan must include measurable objectives and milestones that reach sustainability within 20 years of implementation and allowing for regular reviews of local agencies' progress.  (See §§ 10727.2, subd. (b)(1) [objectives to achieve sustainability goal within 20 years of implementation], 10733 [requiring periodic review], 10733.8 [requiring review at least every five years after initial submission of plan].)

Although preferring local management, part of the penalty when intervention becomes necessary is the imposition of state mandates.  These mandates are triggered by the probationary basin designation.  Once that designation is made, local agencies are given a period of time—either 180 days or one year depending on the basis for the intervention—to remedy any errors leading to the intervention.  (§§ 10735.4, 10735.6.)  If the groundwater plan is not corrected, the State Board is given the right to develop and eventually adopt its own interim plan.  (§ 10735.8.)

In addition, another set of statutes are triggered after a probationary designation.  Under these statutes, certain entities that extract groundwater from a probationary basin more than 90 days after that designation are required to submit reports concerning their extractions to the State Board and pay associated fees.  (§§ 5202, 5203.)  The reports include monthly records of the extractions, measured "by a methodology, water-measuring device, or combination thereof satisfactory" to the State Board, among other things.  (§ 5203.)  The fees imposed are designed for the State Board to recover the costs of the intervention process, "in an amount sufficient to cover all costs incurred and expended from the Water Rights Fund," and can be spread over multiple years. (§ 1529.5, subd. (c).)  Failing to file the required reports may result in an investigation by the State Board that must be paid for by the person investigated and potential criminal and civil penalties.  (§§ 5107, 5204, 5208.)

To the extent relevant, this court will provide additional details on the various statutory requirements of the Act when discussing the issues raised in this case.

## GENERAL FACTUAL AND PROCEDURAL BACKGROUND

Similar to the overview of the Act, this court provides a general factual and procedural background for context. As these actions reach us after a demurrer and a motion for preliminary injunction, we rely on the complaint and submissions related to those proceedings for our overview. Additional detail will be provided when relevant to the underlying issues.

The Tulare subbasin is a high-priority basin under the Act. Accordingly, under the Act, local communities formed five groundwater agencies that worked collectively to manage the Tulare subbasin. These five groundwater agencies developed a single groundwater plan for the Tulare subbasin. In January 2020, the groundwater agencies submitted the groundwater plan to the Department.

Two years later, the Department issued a determination that the groundwater plan was incomplete and provided the groundwater agencies with 180 days to remedy those deficiencies. The groundwater agencies submitted a revised groundwater plan in July 2022. In March 2023, the Department again determined the groundwater plan was inadequate.

The State Board drafted and published a staff report reviewing the groundwater plan, identifying potential remedial actions and recommending the probationary designation be imposed.

The staff report was made available to the public in October 2023. Around the same time, the State Board posted notice of the hearing related to the proposed probationary designation on its website and purports to have sent the notice by electronic mail to its internal listserv, the Department, each city and county within the Tulare subbasin, and to each of the groundwater agencies. In addition, informational workshops were held and public comments taken prior to the hearing.

6.

The hearing then occurred in April 2024. At that time, the State Board agreed with the recommendations in the staff report and designated the Tulare subbasin as a probationary basin under State Board resolution No. 2024-0012. After this designation, the State Board published information related to the monitoring and reporting conditions that are triggered by the designation, along with relevant deadlines.

In May 2024, not long after the probationary designation, the Farm Bureau filed its petition for writ of mandate and complaint. The filing contained nine causes of action, both writ claims and declaratory relief claims, with some of these specifically identifying multiple theories when discussing the claim.[2] The first cause of action, a writ claim, alleged the probationary designation was arbitrary and capricious because 10 different alleged deficiencies lacked adequate factual support. The second cause of action, another writ claim, challenged the determination that no portion of the Tulare subbasin could be excluded under the good actor exemption on the grounds that the State Board misinterpreted the law and failed to support the finding factually. The third cause of action, a complaint claim, alleged an equal protection violation. The fourth cause of action, a writ claim, identified seven aspects of the staff report that allegedly demonstrate the State Board was exceeding its legal authority. The fifth cause of action, another writ claim, alleged the State Board failed to notify landowners of the probationary hearing. The sixth cause of action, a complaint claim, sought declaratory relief and alleged that seven aspects of the staff report reflect improper underground regulations adopted by the State Board. The seventh cause of action, another complaint claim, sought declaratory relief and alleged the fees imposed as a result of the probationary designation violate the California Constitution and Water Code section 1529.5. The eighth cause of action, a writ claim, made the same general allegations as the seventh cause of action. Finally, the

---

[2] We only provide a note about these subparts at this time. Where such subparts are relevant, we provide a fuller discussion in the course of our opinion.

ninth cause of action, a complaint claim, sought general declaratory relief as to whether the probationary designation complied with all applicable laws, rules, and regulations.

The State Board responded by filing a demurrer to as to the third, sixth, seventh, and ninth causes of action in the complaint. Around the same time, the Farm Bureau requested a temporary restraining order or preliminary injunction. The court held a hearing on the preliminary injunction request in August 2024. While this was ongoing, the Farm Bureau submitted its opposition to the demurrer, and the State Board submitted a reply. On September 12, 2024, the trial court issued a 33-page order on the preliminary injunction request. The next day, September 13, 2024, the trial court heard and ruled on the State Board's demurrer.

In summary, the trial court granted the preliminary injunction and granted in part and denied in part the demurrer. With respect to the demurrer, the trial court determined that the Farm Bureau's third cause of action, "asserting the Probationary Designation violates the equal protection clause," failed to adequately state a claim because it did not allege sufficient facts to demonstrate the existence of similarly situated parties being treated differently. This claim was dismissed with leave to amend. The trial court then overruled the demurrer with respect to the sixth, seventh, and ninth causes of action.

On the sixth cause of action, the trial court agreed that the Farm Bureau had adequately pleaded the existence of multiple acts that could constitute improper underground regulations and rejected the State Board's argument that it was expressly exempted from the Administrative Procedures Act (APA) (Gov. Code, § 11340 et seq.). On the seventh cause of action, the trial court rejected the State Board's argument that the "pay first" rule precluded the claim and found that the Farm Bureau "adequately allege[d] the extraction fee is an unlawful tax." Finally, on the ninth cause of action, the trial court rejected the State Board's argument that a general declaratory relief action was improper.

On September 30, 2024, the State Board timely appealed the preliminary injunction. Then, in November 2024, the State Board filed a petition for writ of

8.

supersedeas, arguing the preliminary injunction was prohibitory in nature, improper, and should be stayed to protect the State Board's appeal. Finally, also in November 2024, the State Board filed a petition for writ of mandate challenging the trial court's ruling on demurrer and seeking to stay the underlying proceedings until the writ was resolved.

In light of the overlap between issues raised in the writ of mandate and the appeal, this court begins with the writ of mandate proceedings.

## DISCUSSION

In November 2024, this court issued an order to show cause with respect to the State Board's petition for writ of mandate and stayed further proceedings below. The Farm Bureau filed its return in December 2024, and the State Board filed its reply in January 2025.[3]

The State Board's petition challenges the trial court's demurrer ruling, arguing that three of the Farm Bureau's complaint claims—the sixth, seventh, and ninth causes of action—are defective. The State Board contends that writ review is necessary because the case raises significant legal issues of widespread interest and the risk of improper discovery means such relief is urgently needed. In the following analysis, we consider each of the three complaint claims challenged and ultimately agree that writ relief is warranted.

### *Necessity of Writ Relief*

"Where there is no direct appeal from a trial court's adverse ruling, and the aggrieved party would be compelled to go through a trial and appeal from a final

---

[3]     In the course of these proceedings, both parties filed requests for judicial notice. The State Board requested this court take judicial notice of the fact that three water basins fall within this court's jurisdictional boundaries, along with seven exhibits purportedly showing the petition presents significant legal issues of widespread interest. The Farm Bureau requests this court take judicial notice of the State Board's answer to the causes of action in the complaint subject to the demurrer. These issues are immaterial to our resolution of the writ. We therefore deny the requests. (See *National Asian American Coalition v. Newsom* (2019) 33 Cal.App.5th 993, 1002, fn. 7.)

judgment, a petition for writ of mandate is allowed. [Citation.] Such a situation arises where the trial court has improperly overruled a demurrer. In that instance, the appellate court may direct the trial court to sustain the demurrer by writ of mandate." (*Fair Employment & Housing Commission v. Superior Court* (2004) 115 Cal.App.4th 629, 633.) "Additionally, '[d]iscretionary writ review of an order overruling a demurrer is appropriate where the issue is a matter of public importance and requires immediate resolution.' " (*Coachella Valley Water Dist. v. Superior Court* (2021) 61 Cal.App.5th 755, 765.)

The Farm Bureau challenges the appropriateness of writ relief in this matter. We find such relief proper. As discussed further below, the trial court improperly overruled the challenged demurrer based on purely legal errors, thereby forcing the State Board to litigate these claims. Further, even if that were not the case, we would exercise our discretion to review the trial court's ruling because it involves an issue of public importance that requires immediate resolution. The probationary designation provisions of the Act have not previously been utilized by the State Board. Their implementation, if proper, trigger meaningful and costly requirements for landowners and groundwater extractors throughout the affected basin, including the potential for substantial fees not only for extraction but for violations of the Act's requirements. The proper procedures for implementing State Board oversight of what is the preferably local governance of groundwater and the types of claims that can be made against that implementation raise substantial issues of public importance. Further, the consequences of such actions require an immediate resolution. (See *Cohen v. Superior Court* (2024) 102 Cal.App.5th 706, 715 [discretionary writ review permissible for overruled demurrer where remedy by appeal would be inadequate, a point resolved by the issuance of an order to show cause, and writ presents significant issue of law or issue of widespread or public interest], review granted Sept. 18, 2024, S285484.)

10.

### *Standard of Review*

"A demurrer tests the legal sufficiency of the factual allegations in a complaint." (*Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 558.) " ' "The standard of review for an order overruling a demurrer is de novo.  The reviewing court accepts as true all facts properly pleaded in the complaint in order to determine whether the demurrer should be overruled.  [Citation.]"  [Citations.]  We liberally construe the pleading with a view to substantial justice between the parties.  [Citations.]  We do not, however, assume the truth of the legal contentions, deductions or conclusions; questions of law, such as the interpretation of a statute, are reviewed de novo.' "  (*Cohen v. Superior Court, supra*, 102 Cal.App.5th at p. 716, review granted Sept. 18, 2024, S285484.)  "It is an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment."  (*Tyco Industries, Inc. v. Superior Court* (1985) 164 Cal.App.3d 148, 153.)  However, where "the nature of a plaintiff's claim is clear, but under substantive law no liability exists, leave to amend should be denied, for no amendment could change the result."  (*Ibid.*)

### *The Sixth Cause of Action—Underground Regulations Claim*

We first consider the Farm Bureau's sixth cause of action, which contends that seven aspects of the State Board's staff report reflect underground regulations that violate the APA.  In these writ proceedings, the State Board argues that no viable claim can be made under the APA because the Act exempts the State Board from those legal requirements.  As an alternative, the State Board argues no facts demonstrate the existence of an underground regulation.  The Farm Bureau argues the exemption claim was forfeited because it was not raised to the trial court and it fails as a matter of law. The Farm Bureau further contends its allegations are sufficient to support the claim.

#### *Additional Factual and Procedural Background*

The sixth cause of action begins by alleging that state agencies are required to follow the APA and outlining a claim that the State Board's staff report included several

regulations that were not adopted pursuant to the APA—so called underground regulations. The claim then identifies with specificity seven alleged underground regulations.

The first, called the "State … Board Intervention Regulation," was set out in the staff report as a three-paragraph discussion of the state intervention process. After describing a two-step process of determining through a public process whether to place a basin on probation, and then, if deficiencies are not fixed after at least one year, implementing an interim plan, the alleged regulation discussed the process of determining whether to put a basin on probation. In this section, the staff report stated, "[T]he State … Board analyzes whether deficiencies identified by [the Department] were sufficiently addressed prior to the probationary hearing," and, after considering "the impacts of basin non-compliance on vulnerable communities" pursuant to a State Board resolution, collects "data on groundwater extractions, collect[s] fees from certain groundwater users, and may conduct additional investigations."

The second, called the "State … Board Probationary Designation Regulation," arose because the State Board allegedly "developed a set of rules and standards for the probationary process," including "issuing a draft staff report, taking comments on the draft staff report, finalizing the draft staff report, including staff recommendations on probation in the final staff report, allowing staff to present its staff report and recommendations at a one-day hearing, and allowing [groundwater agencies] less than an hour to present information and evidence related to the Staff Report."

The third, called the "Good Actor Regulation," asserted several statements in the staff report related to section 10735.2, subdivision (e) constitute underground regulations. These include statements that the subdivision "can only apply where a [groundwater agency] is 'implementing a [groundwater plan] capable of achieving sustainable groundwater management,' " and that the " 'only plan covering the Tulare … subbasin is inadequate,' " meaning " 'no [groundwater agencies] implementing the plan would

12.

qualify for the exemption' " because groundwater agencies " 'cannot qualify for the good actor exemption with plans that do not meet [the Act's] requirements.' "

The fourth, called the "Probation Exit Regulation," identified statements in the staff report that " '[a]fter [groundwater agencies] have adopted a revised plan (or plans) that resolve the deficiencies, they can seek to exit probationary status by submitting the plan (or plans) to the State … Board.  If the State … Board determines that deficiencies were addressed, the [State] Board may resolve to have the [groundwater agency or agencies] exit probation.' "

The fifth, called the "Continued [Groundwater Agency] Management Regulation," focused on an alleged "set of rules and standards that require [groundwater agencies] to manage pursuant to the existing, although inadequate, [groundwater plan] during the probationary period."  This is supported in a statement from the staff report that " 'the [groundwater agency] retains its authorities and responsibilities and must continue to implement its [groundwater plan] regardless of if the basin is in probation.' "

The sixth, called the "Well Mitigation Regulation," again came from statements made in the staff report.  In this alleged regulation, the staff report requires actions to " '[e]stablish accessible, comprehensive, and appropriately funded well impact mitigation programs that mitigate impacts to wells affected by lowering of groundwater levels and degradation of water quality.' "

The seventh, called the "[The Department] Coordination Regulation," is alleged based on multiple statements "that the State … Board coordinated with [the Department]."  According to the complaint, the State Board and the Department "developed a process by which the State … Board and [the Department] coordinated on the 2022 [Groundwater Plan] Inadequate Determination, the Staff Report, and the State … Board's intervention process," and that this process constitutes the underground regulation.

13.

Across all of the alleged underground regulations identified, the Farm Bureau alleged the regulation was being applied generally across the Tulare subbasin and other subbasins, including the Kaweah subbasin. The Farm Bureau also generally alleged that the State Board received comments asking about these actions or the import of the purported regulations but still failed to adopt the regulations in a lawful and transparent manner and otherwise developed them as unlawful underground regulations.

The State Board's demurrer initially relied on a legal argument that none of the seven alleged underground regulations qualified as regulations under the APA. In its reply briefing, the State Board also argued that its conduct was exempt under section 10736. The trial court overruled the demurrer, finding that the Farm Bureau stated a valid cause of action. Focusing first on the State Board Intervention Regulation, the trial court found the alleged regulations were generally applicable and that the State Board was interpreting the law in at least three ways—by (1) creating "concurrent jurisdiction between the [State] Board and local management during the [State] Board's intervention; (2) incorporating "its Resolution with respect to racial injustice and inclusion"; and (3) requiring the collection of "data on groundwater extractions for development of an interim plan during the probationary period."

The trial court also briefly considered each of the other six alleged underground regulations. After noting that the complaint "adequately alleges the intended general applicability of the alleged underground regulations," the trial court found it could not hold "as a matter of law at the demurrer stage, that the regulations are merely 'embod[iments] [of] the only legally tenable interpretation of a provision of law.' " The court found (1) the State Board's interpretation of the law in the Good Actor Regulation was erroneous, (2) the Department Coordination Regulation was satisfied through allegations "the [State] Board met with [the Department] pursuant to a protocol or process" and that no steps beyond compliance with the Act were required, and (3) the State Board Probationary Designation Regulation, Probation Exit Regulation, Continued

14.

Groundwater Agency Management Regulation, and Well Mitigation Regulation were generally applicable, were not argued to be the only tenable interpretation of the law, and appeared to exceed the scope of the Act, regardless.

Additionally, the trial court considered the State Board's argument that its actions were exempt from the APA. The trial court rejected this argument "since 'procedures for adopting a determination' are *not* exempt from the APA under [section 10736,] subdivision (d)(2)" and any "procedures for issuing the Probationary Designation must comply with the APA."

*Applicable Law*

"Under the APA, 'regulation' is defined as 'every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure.' (Gov. Code, § 11342.600.) This is a very broad definition, providing two principal identifying characteristics for regulations. [Citation.] 'First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must "implement, interpret, or make specific the law enforced or administered by [the agency], or ... govern [the agency's] procedure." ' " (*Malaga County Water Dist. v. Central Valley Regional Water Quality Control Bd.* (2020) 58 Cal.App.5th 418, 434, first bracketed insertion added.)

The APA provides: "No state agency shall issue, utilize, enforce, or attempt to enforce ... a regulation" without complying with the APA's notice and comment provisions. (Gov. Code, § 11340.5, subd. (a).) A regulation adopted without complying with the APA's notice and comment provisions is known as an underground regulation and is generally invalid. (*Naturist Action Com. v. Department of Parks & Recreation* (2009) 175 Cal.App.4th 1244, 1250.)

Under section 10736, subdivision (d), however, the State Board is exempted from compliance with the standard APA requirements, identified as "Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 2 of Title 2 of the Government Code." In full, the statute reads:

"(d) [¶] (1) Except as provided in paragraphs (2) and (3), [the APA] does not apply to any action authorized pursuant to Section 10735.2 or 10735.8.

"(2) The [State Board] may adopt a regulation in accordance with [the APA] setting procedures for adopting a determination or plan.

"(3) The [State Board] may adopt a regulation applying or interpreting this part pursuant to Section 1530 if the [State Board] determines that the emergency regulation is reasonably necessary for the allocation, administration, or collection of fees authorized pursuant to Section 1529.5." (§ 10736, subd. (d).)

" ' " 'When we interpret a statute, "[o]ur fundamental task … is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " ' " (*In re N.R.* (2023) 15 Cal.5th 520, 538–539.)

16.

*Analysis*

The State Board contends that all seven of the alleged underground regulations cover topics that are exempt from APA compliance under section 10736, subdivision (d) because they are all associated with authorized actions under section 10735.2. In response, the Farm Bureau argues this issue was forfeited below, that the exemption is properly limited to statutorily defined actions such as "the ability to require monitoring, reporting, and installing measuring devices," and that section 10736, subdivision (d)(2) should be read to require APA compliance whenever procedural regulations are developed.

### The issue has not been forfeited.

We begin with the forfeiture argument. The Farm Bureau recognizes that the State Board raised an exemption argument in its reply briefing on the demurrer but contends the trial court correctly rejected that claim as untimely and that this court should do the same. The Farm Bureau's argument, however, asserts that section 10736, "subdivision (d)(2) … is the basis of [the State Board's] new argument in this writ Petition" and does not contend a claim under section 10736, subdivision (d)(1) was forfeited. Upon review, the State Board's claim is the same as that raised below, that under section 10736, subdivision (d)(1), its conduct is exempt from the APA. The discussion of section 10736, subdivision (d)(2) only operates as a confirmation that there are no meaningful limitations to the exemption under section 10736, subdivision (d)(1) that would hinder the State Board's claim. We find no basis to conclude the State Board forfeited this argument. However, even if we were to consider the State Board's argument to be newly raised, we would exercise our discretion to resolve the dispute. (See *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 750 ["It is well established that appellate courts have the discretion to decide a question of law raised for the first time on appeal."].)

17.

<u>The statute is ambiguous.</u>

The State Board contends that section 10736, subdivision (d)(1) is unambiguous in its language and can only be read to grant a full exemption from all APA requirements for actions taken under section 10735.2. We do not agree.

The words of a statute are given their usual and ordinary meaning when viewed in the context of the statute as a whole. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184.) "As part of this process, ' " '[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " ' " (*Ibid.*) A statute is ambiguous "when the words of the statute are susceptible to more than one reasonable meaning, given their usual and ordinary meaning and considered in the context of the statute as a whole." (*Ibid.*)

Section 10736, subdivision (d)(1) does provide an unambiguous exclusion from the APA to "any action authorized pursuant to Section 10735.2 or 10735.8." However, at least two ambiguities exist in the statute. First, the meaning of "any action authorized" can be interpreted, as the State Board suggests, to cover all aspects of the decisionmaking process for authorized actions or, as the Farm Bureau argues, to cover only the actual act of making the decision. Second, the structure of section 10736, subdivision (d)(1) creates an ambiguity with respect to the scope of the exemption granted, particularly when viewed in the context of section 10736, subdivision (d)(2) and (3).

On this second point, section 10736, subdivision (d)(1) is drafted to read that "except as provided" in section 10736, subdivision (d)(2) and (3), the APA does not apply to the State Board's authorized actions. The sentence structure implies that paragraphs (2) and (3) will limit the scope of the APA exemption. Both of the paragraphs, however, only state that the State Board "may adopt" certain regulations under some part of the

18.

APA.[4] As the State Board notes, the Water Code expressly defines the word "may" as permissive, a definition that applies to the Act. (§ 15.) The use of permissive language following a broad exemption suggests that there is, in fact, no limitation to the scope of the APA exemption, unless the State Board chooses to exercise its discretion to comply with the APA when adopting the regulations identified in the subdivisions. This is how the State Board would have the court read the purportedly unambiguous language.

The Farm Bureau argues for a different reading. Looking at section 10736, subdivision (d)(2), the Farm Bureau reads the following italicized portion of "may adopt a regulation *in accordance with* [*the APA*] setting procedures for adopting a determination or plan" to be descriptive of how to adopt the regulation. Under this reading, one may adopt a regulation setting procedures for adopting a determination or plan, but only if that is done so in accordance with the APA. Any procedural regulations not adopted under the APA would be excluded from the general exemption contained in section 10736, subdivision (d)(1).

Neither of these readings is facially invalid. The exemption is therefore ambiguous. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego, supra*, 7 Cal.5th at p. 1184.)

<u>State Board proceedings are exempt from the APA.</u>

We must therefore determine the Legislature's intent in enacting section 10736. The heart of the State Board's argument is that all activities taken pursuant to sections 10735.2 and 10735.8 are exempt from the APA. According to the State Board, section 10736, subdivision (d)(2) provides the State Board with an option to develop regulations pursuant to the APA but does not require it to do so, even if regulations are developed. The Farm Bureau argues such a reading would wholly eliminate any meaning

---

[4] The reference to section 1530 in section 10736 subdivision (d)(3) is, in effect, a reference to the procedures for adopting an emergency regulation under the APA. (See § 1530, subd. (b) [referring to the APA].)

19.

from section 10736, subdivision (d)(2). While we agree that the State Board's position takes much of the potential meaning out of section 10736, subdivision (d)(2), our review of the entire statutory scheme demonstrates this is likely the Legislature's intent. Accordingly, we conclude that all activities taken under either section 10735.2 or 10735.8 are exempt from the APA and that this exemption is not lost even if the State Board utilizes regulations "setting procedures for adopting a determination or plan."

We begin with section 10736, subdivision (d)(1). As noted, this subdivision states: "Except as provided in paragraphs (2) and (3), [the APA] does not apply to any action authorized pursuant to Section 10735.2 or 10735.8." The first point to resolve is what the Legislature meant by "any action authorized pursuant to." The State Board argues this refers to any and all portions of the relevant sections, including the designation of a probationary basin under section 10735.2, subdivision (a). The Farm Bureau contends it refers—at least in the probationary designation stage—only to those specific determinations disclosed in section 10735.2, subdivision (c).

The State Board's reading more readily matches the language of section 10736, subdivision (d)(1), which refers in an unqualified manner to any action authorized pursuant to the probationary determination and interim plan statutes. (See *Western/California, Ltd. v. Dry Creek Joint Elementary School Dist.* (1996) 50 Cal.App.4th 1461, 1486 [statute referring to public agencies acting "pursuant to" another act included all agencies covered by that act and not just those fitting the title].) The State Board's position is further supported by the fact the Legislature later adopted similar language for section 10736.2 that supports the State Board's reading. As originally drafted, section 10736.2 provided that "any action or failure to act by" the State Board was exempt from the California Environmental Quality Act (Pub. Resources Code § 21000 et seq.), "other than the adoption or amendment of an interim plan." (Stats. 2014, ch. 347, § 19.) However, in 2022, the Legislature amended the statute to also exempt adopting an interim plan. (See Stats. 2022, ch. 60, § 42.) In doing so, it

20.

revised the statutory language to state that the California Environmental Quality Act does not apply to "(1) [a]n action by the [State Board] pursuant to Section 10735.2" and "(2) [t]he adoption or amendment of an interim plan pursuant to this chapter." (§ 10736.2, subd. (a)(1), (2), as amended by Stats. 2022, ch. 60, § 42.) The Legislature thus expressed an understanding that "an action" under section 10735.2 included the act of designating a probationary basin, as that act was exempt before the amendment and not affected by the change in language. (Stats. 2022, ch. 60, No. 17, West's Cal. Legis Service, p. 3005 ["This bill would revise the above exemption to apply to actions taken by the [State Board] to designate a groundwater basin as a probationary basin and the adoption or amendment of an interim plan."].)

The State Board's reading is also supported by the definition of "Probationary basin" contained in section 10735, subdivision (c): "a basin for which the [State Board] has issued a determination under Section 10735.2." According to this definition, issuing a determination is an act required under section 10735.2, but that act is not described or defined within the section. Rather, section 10735.2, subdivision (a) requires the State Board to "designate a high- or medium-priority basin as a probationary basin" according to several factual findings and actions discussed in section 10735.2 subdivisions (a) and (b). The section does not reference a specific determination made by the State Board until section 10735.2, subdivision (c).[5] That subdivision refers to the probationary designation of section 10735.2, subdivision (a) as "[t]he determination" in a manner that makes clear a determination is the act that designates a basin as probationary. The definition confirms that at least one act authorized pursuant to section 10735.2 is the act

---

[5]     The factual findings in section 10735.2, subdivision (a)(3) and (5) do reference factual determinations, but those are made by the Department, in consultation with the State Board, and do not factor into a proper understanding of the exemption statute because the Department's actions are required to comply with the APA's emergency regulation provisions under section 10733.2, subdivision (d).

of designating a probationary basin by issuing a determination the basin meets one of the statutory requirements for that designation.

Since the statutory language appears to exempt all actions taken by the State Board under the relevant sections, the next question to consider is how to read the "except as provided in" language of section 10736, subdivision (d)(1). Normally, "except as provided in" is understood according to its plain and ordinary meaning as a statement that one statute applies in the case where two statutes conflict and both cover the situation. (*Cyan Inc. v. Beaver County Employees Retirement Fund* (2018) 583 U.S. 416, 427–428.) But in rare instances, exceptions can arise. (See *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 610 [finding "[e]xcept as provided in subdivision (e) … all of the following shall apply" ambiguous].) This case appears to be one of those exceptions. There can be no conflict between the statutes if the State Board is exempt for all actions, except where, in its discretion, it is not. The Legislature thus must have meant something other than apply the general rule except where a conflict arises.

To determine what the Legislature intended, we consider the full statute and, particularly, the language used in section 10736, subdivision (d)(3), the clearest of the "except as provided in" subdivisions. Section 10736, subdivision (d)(3) provides an easier path to understanding the Legislature's intent for "except as provided in" because it contains a fuller explanation of its triggering factors and ties more fully into the statutory scheme. Under section 10736, subdivision (d)(3), the State Board "may adopt a regulation applying or interpreting this part[6] pursuant to Section 1530 if the [State Board] determines that the emergency regulation is reasonably necessary for the allocation, administration, or collection of fees authorized pursuant to Section 1529.5."

---

**6** This part refers to the entirety of the Act, part 2.74 (commencing with section 10720) of division 6 of the Water Code, and includes sections 10735.2 and 10735.8 as referenced in section 10736, subdivision (d)(1).

Notably, the statutory scheme already provides a partial exemption to the APA in section 1530, where the State Board "shall adopt, by emergency regulation, the schedules of fees authorized under this article" in accordance with the APA. (§ 1530, subd. (a).) Section 1529.5 further authorizes adopting fees related to the Act under section 1530. Thus, the terms of section 10736, subdivision (d)(3) limit a broad exemption to the APA to ensure regulations needed to effectuate section 1529.5 are enacted in line with the statutory scheme for regulations covering those fees. In other words, under section 10736, subdivision (d)(3), the State Board is offered the option of adopting emergency regulations regarding any part of the Act, including those actions taken under section 10735.2 that would otherwise be exempt, if it determines those emergency regulations are needed to implement the fees authorized in section 1529.5. The "may adopt a regulation" language is thus best understood as expressing a legislative intent to provide a broader grant of authority to interpret anything needed to effectuate section 1529.5, provided the proper APA exemption is utilized for fee matters.

This understanding of the Legislature's intent is more difficult to apply to section 10736, subdivision (d)(2) because there is no express triggering determination and no existing statutory directive referenced by the provision. Rather, the provision merely states that the State Board "may" adopt a regulation in accordance with the APA when setting procedures for adopting a determination or plan. Nothing in the statute states under what circumstances the State Board may do so—for example, in all procedural matters as argued by the Farm Bureau or only when expressly adopting state-wide policy as argued by the State Board—and nothing in the statute suggests the choice ties into an already required application of the APA. Rather, the phrase follows a provision granting the State Board a broad exemption to the APA when acting to determine a basis satisfies the test for a probationary basin and then appears to cover some portion of the same actions already exempted. Further, the use of the statutorily defined permissive "may" (see § 15), without a triggering condition, suggests only a

23.

grant of discretion to act in a manner if the State Board so desires. Overall, this does not clearly suggest a legislative intent to create a broader exemption under a more specific standard as outlined in section 10736, subdivision (d)(3) but does indicate, as occurred in section 10736, subdivision (d)(3), that the Legislature was providing the State Board an option to act in a certain way if it determines there is a need to do so.

Although it severely limits the use of the APA with regard to regulations covering procedural matters, the only reading this court finds viable in the context of the statutory scheme is one that mirrors as closely as possible the intent disclosed in section 10736, subdivision (d)(3). (See *In re Mark K.* (1984) 159 Cal.App.3d 94, 106 ["As a matter of statutory interpretation, we presume that the Legislature intended the repeated use of identical words or phrases within a single statute to be consistent in their meaning."].) Under this reading, if the State Board finds the action is needed—in this case that there is a need for formal regulations regarding procedures for adopting a determination or plan—the State Board may choose to adopt those regulations through the APA. Should the State Board not wish to create formal regulations (i.e., where the State Board decides to act in line with its general exemption to the APA), it remains exempt from the APA for all acts pursuant to sections 10735.2 and 10735.8 even where its conduct implies an underground regulation is in use. This reading gives effect to the intent clearly displayed in section 10736, subdivision (d)(3) to allow for conduct that effectuates the statutory scheme as written while acknowledging that the scheme as written only provides a discretionary application of the APA to procedural regulations implemented by the State Board while otherwise completely exempting the proceedings from the APA.

Finally, this reading tracks the general statement in section 10736, subdivision (a) that the State Board "shall adopt or amend a determination or interim plan under section 10735.2 or 10735.8 in accordance with procedures for quasi-legislative action." It is well settled that quasi-legislative actions do not trigger procedural due process protections. (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612.) Rather, a court

24.

reviews such actions to "determine whether the agency acted within the scope of its delegated authority, whether it employed fair procedures, and whether its action is arbitrary, capricious, or lacking in evidentiary support." (*Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 509.) Here, accounting for the APA exception in section 10736, subdivision (d)(1), the legally required procedures are set out in section 10736, subdivision (b), along with sections 10735.2 and 10735.8. In light of the importance of the underlying decisions and the limited statutorily defined procedural requirements, the Legislature could fairly decide that, should the need arise, the State Board should not be precluded from adopting formal procedural regulations under the APA, even though such actions are not required for quasi-legislative decisions.

Application in this case.

Our analysis of section 10736, subdivision (d)(1) and (2) means that the State Board's proceedings under sections 10735.2 and 10735.8 are exempt from the APA and that even if procedural regulations are developed, they remain exempt from the APA unless the State Board utilizes its discretion to adopt them under the APA. Based on this conclusion, the Farm Bureau's sixth cause of action is not viable under any theory presented. The State Board cannot be held to have used an underground regulation in violation of the APA when the relevant proceedings are exempt from the APA. Nor does the court see a viable path to amend the complaint to state a claim under the APA. Even if the State Board utilized its discretion to implement regulations under the APA, it's actions outside of the specific regulations developed remain exempt under section 10736, subdivision (d)(1), and its failure to properly follow the APA would not result in a valid assertion the State Board utilized an underground regulation.

### *The Seventh Cause of Action—Propositions 13 and 26 Claim*

The Farm Bureau's seventh cause of action contends that certain fees[7] set under section 1529.5 by the State Board impose a tax that was not passed by a two-third's majority of the Legislature as required by article XIII A, section 3 of the California Constitution.[8] The State Board contends that this claim is subject to the "pay first" rule set out in article XIII, section 32. The Farm Bureau contends the pay first rule does not apply because they are challenging regulatory fees, not outstanding taxes, but that even if it did, the rule would not bar this action because the fees are not yet due.

*Additional Factual and Procedural Background*

The seventh cause of action begins with a recitation of several legal principles related to the imposition of the contested fee. In that recitation, the Farm Bureau contends that the State Board is authorized under section 1529.5 to adopt a schedule of fees by emergency regulation pursuant to section 1530 to recover costs incurred in administering the Act. The complaint alleges that all such fees must be set in accordance with article XIII A, section 3, which was approved as Proposition 13 in 1978 and later amended by Proposition 26 in 2010. The complaint states that under the article XIII A, all taxes imposed must be passed by a two-thirds majority but acknowledges that, unlike taxes, regulatory fees only need a simple majority.

The complaint notes that section 1529.5 was passed by less than a two-thirds vote and asserts the section is invalid if it is a tax rather than a regulatory fee. The complaint then outlines legal principles for determining whether a charge or levee is considered a fee or a tax, along with a statement that the burden of proving the nature of the charge lies on the State Board.

---

[7]    The complaint identifies the $20 per acre-foot extraction fee while the proceedings also reference a base filing fee of $300 per well.

[8]    Unspecified references to "articles" refer to the California Constitution.

26.

From there, the complaint alleges that the State Board first adopted a fee schedule under section 1529.5 in 2017 but only modified it to add "a volumetric charge of $20 per acre-foot of groundwater extracted during the preceding water year" in March 2024 and that this fee did not become final and effective until April 17, 2024. Further, the complaint explains that the fee became applicable to the Farm Bureau "on or about April 16, 2024, when the State … Board adopted the Probationary Designation."

The claim closes with four statements why the "$20/AF Extraction Fee" is an unlawful tax: (1) "[T]he amount of the fee exceeds the reasonable costs of providing the services for which it is charged"; (2) "[I]t is levied for revenue purposes unrelated to the services for which it is charged"; (3) "[T]he amount of the fee does not bear a reasonable relationship to the burdens created by the fee payers' activities or operations"; and (4) [I]t exceeds recoverable costs as that term is defined in … section 1529.5." The claim requests a "declaration that the $20/AF Extraction Fee is invalid, unconstitutional, unlawful, and otherwise improper."

The State Board's demurrer relied in part on the assertion that "article XIII, section 32 bars [the Farm Bureau's] challenge to the Extraction Fee unless and until [the Farm Bureau] pay[s] the challenged fee," a provision known as the "pay first" doctrine. In their opposition, the Farm Bureau challenged the doctrine's applicability on timing grounds, alleging a conflict between their statutory obligation to challenge the probationary determination within 30 days of April 16, 2024, and the fact an obligation to pay any fees would not arise until April 1, 2025. The trial court ultimately adopted this contention, finding *Mojave Pistachios, supra*, 99 Cal.App.5th at page 632, footnote 20 stands for the proposition that the Farm Bureau's "need to comply with the filing deadline for challenging the Probationary Designation and resulting application of the emergency fee regulation does not preclude their filing, or maintenance of, the instant action based on a failure to allege actual payment."

27.

*Applicable Law*

Embodying a concept that has been present in California law since the 1800's, article XIII, section 32, provides: "No legal or equitable process shall issue in any proceeding in any court against this state or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." (Art. XIII, § 32; see *Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 282 [concept appearing in equity as early as 1852]; *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 314, fn. 1 [noting history of the provision and addition to the California Constitution in 1910].) This is the pay first rule.

The well-settled import of this constitutional directive is that a " 'taxpayer may not go into court and obtain adjudication of the validity of a tax which is due but not yet paid' " in order that " ' "essential public services are not disrupted during the pendency of tax challenges." ' " (*Hovannisian v. City of Fresno* (2024) 107 Cal.App.5th 833, 840 (*Hovannisian*).) Accordingly, "California courts have repeatedly denied mandamus, injunctive and declaratory relief where a taxpayer has failed to pay an assessed tax before filing a refund action." (*Flying Dutchman Park, Inc. v. City and County of San Francisco* (2001) 93 Cal.App.4th 1129, 1135.)

There are certain limited exceptions to the rule. As outlined in *Mojave Pistachios*, these include situations (1) "when the tax ordinance being challenged provides for criminal penalties for failure to pay," (2) where "the party seeking to prevent the tax collection has no adequate remedy at law," and (3) "when the ban on prepayment judicial review violates the federal Constitution." (*Mojave Pistachios, supra*, 99 Cal.App.5th at pp. 628–629.) In addition, *Mojave Pistachios* recognizes two workarounds to the pay first rule. First, the Legislature can specifically create a prepayment remedy if it provides a clear and certain remedy through a predeprivation process. (*Id.* at p. 632, fn. 20.) Second, where a statute of limitations may affect the ability to timely bring the suit

28.

because no tax was owed prior to the end of the limitations period, a suit can be filed but the tax must be paid when due to maintain the action. (*Ibid.*)[9]

*Analysis*

Although the trial court relied on one of the narrow workarounds disclosed in *Mojave Pistachios*, the parties raise much broader challenges to the applicability of the pay first rule in this case. They initially dispute whether the challenge here is to a tax or a fee, a fundamental issue for applying the pay first rule. Then they clash over whether an exception to the rule applies based on when the fees are assessed and if an applicable statute of limitations required early filing. Finally, they propose different solutions should we find the trial court erred. We consider each in turn.

<u>The tax versus fee dispute.</u>

Although broadly written and interpreted, the pay first rule does have limitations. One of these is that it applies only to actions which impede the collection of taxes. (Art. XIII, § 32 ["to prevent or enjoin the collection of any tax"]; see *Hovannisian, supra*, 107 Cal.App.5th at pp. 841–843 [rejecting claim that assessment did not qualify as a tax under related statute].) What constitutes a tax, however, is not always easy to discern. (See *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 437 (*California Farm Bureau Federation*) [noting tax has no fixed meaning and the distinction between a tax and fee is frequently blurred, taking on different meanings in different contexts].)

Likewise, the scope of a regulatory fee is also "somewhat flexible and is related to the overall purposes of the regulatory governmental action." (*California Farm Bureau Federation, supra*, 51 Cal.4th at p. 438.) " ' "A regulatory fee may be imposed under the

---

[9]     This second workaround appears to be a practical solution developed in response to arguments made in *Mojave Pistachios*. It is unclear if such a workaround is needed, however, as our Supreme Court has held that the imposition of a tax is a continuing harm that resets statutes of limitations each time it is imposed. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 818–825.)

29.

police power when the fee constitutes an amount necessary to carry out the purposes and provisions of the regulation." ' " (*Ibid.*) " 'Regulatory fees are valid despite the absence of any perceived "benefit" accruing to the fee payers. [Citation.] Legislators "need only apply sound judgment and consider 'probabilities according to the best honest viewpoint of informed officials' in determining the amount of the regulatory fee." [Citation.]' [Citation.] 'Simply because a fee exceeds the reasonable cost of providing the service or regulatory activity for which it is charged does not transform it into a tax.' " (*Ibid.*, third bracketed insertion added.)

The Farm Bureau points out that the fees authorized by section 1529.5 are specifically structured so they do not qualify as a tax. Article XIII A, section 3, subdivision (a) provides that any "change in state statute which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature." Article XIII A, section 3, subdivision (b) then defines tax "[a]s used in this section," to mean "any levy, charge, or exaction of any kind imposed by the State, except" charges imposed for (1) a specific benefit to the payor not provided to those not charged and not exceeding the reasonable costs to the state of granting the benefit; (2) a specific government service not provided to those not charged and not exceeding the reasonable costs to the state of providing the service; (3) the reasonable regulatory costs to the state of issuing licenses and permits, as well as performing investigations, inspections, and audits, including the administrative enforcement and adjudication efforts; (4) entering or using state property; and (5) violations of law by the judicial branch.

Section 1529.5, subdivision (c) acknowledges and mirrors article XIII A, section 3 and provides: "Consistent with Section 3 of Article XIII A of the California Constitution, the [State Board] shall set the fees under this section in an amount sufficient to cover all costs incurred and expended from the Water Rights Fund for the purposes of Part 5.2 (commencing with Section 5200) and Chapter 11 (commencing with Section 10735) of

Part 2.74 of Division 6 of the Water Code.  In setting these fees, the [State Board] is not required to fully recover these costs in the year or the year immediately after the costs are incurred, but the [State Board] may provide for recovery of these costs over a period of years."  In this way, the fee authorization is most naturally read as permitting fees, not taxes, that reflect the reasonable regulatory costs to the state of implementing the monitoring, investigation, and enforcement aspects of the Act when state intervention occurs.

Further adding support to the fee position is the fact that section 1529.5, subdivision (a) instructs the State Board to "adopt a schedule of fees pursuant to Section 1530" and defines recoverable costs as including, but "not limited to, costs incurred in connection with investigations, facilitation, monitoring, hearings, enforcement, and administrative costs."  Aside from again mirroring the fees excluded from the definition of a tax in article XIII A, the reference to section 1530 infers an expectation that the fees will not constitute a tax based on *California Farm Bureau Federation*, which held that the language of section 1525 facially demonstrates an intent to impose a fee, not a tax.  (*California Farm Bureau Federation, supra*, 51 Cal.4th at p. 438.)

*California Farm Bureau Federation* does not, however, fully resolve this issue.  In that case, the court never considered the application of article XIII, section 32, likely because it appears the plaintiffs had, in fact, paid the disputed fees prior to bringing suit.  (*California Farm Bureau Federation, supra*, 51 Cal.4th at p. 435 [noting more than $7.4 million in fees was collected for the relevant fiscal year and that refunds were requested].)  Cases do not stand for propositions not considered.  (*People v. Nash* (2020) 52 Cal.App.5th 1041, 1078.)  Complicating the issue is the case law that does exist in this space.  Although no case has considered the nature of fees imposed under section 1529.5, many have considered disputes arising under one version or another of the pay first rule.

In cases involving various types of assessments, including both general water assessments and local agency assessments imposed under the Act, courts have consistently applied the pay first rule, either implying or directly finding that the challenged assessment in each case constitutes a tax. (See *Mojave Pistachios, supra*, 99 Cal.App.5th at pp. 629–630 [discussing application of pay first rule in water cases]; *Hovannisian, supra*, 107 Cal.App.5th at pp. 839–842 [special assessment to abate nuisances added to property taxes that were collected at the same time and in the same manner as county taxes were a tax].) These too, are lacking in their ability to clearly resolve this issue. *Mojave Pistachios*, for example, found that fees imposed by local agencies under the Act were subject to the pay first rule—fees that are functionally similar to those imposed by the State Board—but did so because section 10726.6, subdivision (d) specifically imposed the pay first rule on such fees. (*Mojave Pistachios*, at p. 630.) No similar provision exists with respect to fees imposed under section 1529.5.

Perhaps most relevant to this case is *Water Replenishment Dist. of Southern California v. City of Cerritos* (2013) 220 Cal.App.4th 1450 (*Cerritos*). In that case, the City of Cerritos stopped paying an assessment imposed for costs associated with replenishing extracted groundwater after an interim ruling that the assessment violated Proposition 218. (*Cerritos*, at p. 1453.) The Water Replenishment District sought an injunction to prevent future water extractions unless the assessment was paid. (*Id.* at pp. 1453–1454.) In requiring the trial court enter this injunction, the Court of Appeal found that the pay first rule barred the City of Cerritos from challenging the requested injunction when it had not paid the challenged assessments and no final order had been entered invalidating the assessments under Proposition 218. (*Id.* at p. 1464.)

In clear dicta at the conclusion of its opinion, the court noted that "the City in this appeal does not contend that the assessment is not a 'tax' within the meaning of section 32 of article XIII." (*Cerritos, supra*, 220 Cal.App.4th at p. 1469.) Despite this, the court explained that the pay first rule "has been applied to a wide variety of taxes"

32.

and reasoned that because Proposition 218 sought to limit excessive assessments in the same manner as tax increases under Proposition 13, the "City cannot claim the assessment is not a 'tax' and at the same time seek protection under Proposition 218, which seeks to maintain the intentions of Proposition 13." (*Cerritos*, at p. 1470.) In other words, regardless of the nature of the assessment, a challenge raised under tax concepts triggered the pay first rule.

Here too, the challenge raised relies on concepts designed to limit excessive taxation. The claim itself specifically alleges that the extraction fee constitutes an unlawful tax in three of four express challenges. In the fourth, while not calling the fee a tax, the challenge ultimately relies on the fact that failing to satisfy the statutory requirements for imposing the fee means it failed to meet any of the intended exemptions from the definition of a tax referenced in the statute. While the statute may have intended to impose a fee, the lawsuit clearly turns on whether failure to meet that requirement renders the exaction a tax. In the context of the challenges raised in this case, we think this latter fact sufficient to trigger application of the pay first rule.

We are hesitant to adopt a rule that relies more on the technical structure of the pleadings than the underlying nature of the dispute. But the malleable definition of both a tax and a fee, coupled with a heavy thumb placed on the scale from the constitutional directive and strong public policy precluding prepayment actions against taxes, justifies a standard that at least considers the legal grounds asserted in the case. Here, although the structure of the statutory scheme clearly indicates a fee was intended, the Farm Bureau chose to attack that fee as if it were a tax. In doing so, it triggered the protections of article XIII, section 32, as the challenge is now regarded as attacking a potential tax.

No exception applies in this instance.

Having concluded that the Farm Bureau's seventh cause of action triggered the protections of article XIII, section 32, we next consider whether an exception to that constitutional provision exists which would allow the claim to proceed despite the Farm

33.

Bureau's lack of payment. The trial court found such an exception in one of the workarounds discussed in *Mojave Pistachios*. On appeal, the Farm Bureau relies on that ruling while also making a broader argument that the rule cannot apply until a tax is actually due. Ultimately, while there is a path to immediately challenging the State Board's decision, we conclude that path does not allow the seventh cause of action to proceed prior to payment of the alleged tax.

We begin with the Farm Bureau's broadest assertion, that the pay first rule does not apply because the Farm Bureau does "not seek to invalidate 'an outstanding tax assessment.' " Relying on *California Dept. of Tax & Fee Administration v. Superior Court* (2020) 48 Cal.App.5th 922, 933 (*Department of Tax & Fee Administration*), the Farm Bureau argues that the pay first rule only applies to outstanding tax assessments and, according to the Farm Bureau, no "fees challenged in this case 'are due and payable' " prior to " 'April 1 [2025], or thirty days after the [State] Board issues an invoice, whichever is later.' " We do not agree.

*Department of Tax & Fee Administration* is not as permissive of tax challenges as the Farm Bureau suggests. At the outset, the court explains that " ' "a taxpayer may not circumvent [article XIII, section 32's] restrains on prepayment tax litigation by seeking only declaratory relief" ' " when the ' "net result" ' or ' "effect" ' of granting that declaratory relief is to absolve the taxpayer of liability for the disputed tax." (*Department of Tax & Fee Administration, supra*, 48 Cal.App.5th at p. 931.) This applies broadly because "adjudication of such declaratory relief claims would be binding on the state in any further proceedings regarding the taxpayer's liability" such that "resolving such claims would effectively prevent or enjoin the state from collecting the disputed tax." (*Ibid.*)

As the Farm Bureau notes, when discussing the possibility of harmonizing the pay first rule with the statutory authorization to seek declaratory relief, *Department of Tax & Fee Administration* did suggest some claims could proceed despite the pay first rule. In

34.

doing so, it noted that the " 'pay first' rule governs those declaratory relief claims that have the net result or effect of invalidating an outstanding tax assessment, while section 11350 governs those declaratory relief claims that have no such result or effect, such as claims by (1) persons attacking nontax regulations or persons attacking tax regulations but having no outstanding tax assessments, *such as persons who are not the taxpayer* [citation] or (2) persons who are taxpayers facing tax assessments *in the future* (e.g., *Andal* [*v. City of Stockton* (2006)] 137 Cal.App.4th [86,] 90–93 [taxpayers who have paid all outstanding tax assessments but who wish to challenge future assessments may seek declaratory relief as to validity of regulation affecting them]; [Citations.])." (*Department of Tax & Fee Administration, supra*, 48 Cal.App.5th at p. 933, first italics added, fourth bracketed insertion in original.)[10]

The Farm Bureau argues *Department of Tax & Fee Administration* stands for the proposition that one can file a declaratory judgment action so long as one does not owe an "outstanding tax assessment." However, as the citation shows, those declaratory relief actions that might harmonize with the pay first rule do not turn on just whether there is an "outstanding tax assessment." Rather, potentially permissible cases are those which would not affect the collection of any tax either because the challenged tax would not apply to the person filing the suit or has already been paid to the point the suit was filed.[11] Neither situation is present here, where the purported taxpayer is challenging the

---

**10** The Farm Bureau's citation to this principle excised the first italicized statement through ellipses and excluded the internal citation limiting the scope of the second italicized statement.

**11** Nor is it clear that *Department of Tax & Fee Administration* properly states the law. On the first point, the case cited relies more on the fact that the taxability issue is not contested than it does on any claim a nontaxpayer can contest the action. (See *McClain v. Sav-On Drugs* (2019) 6 Cal.5th 951, 960 [finding "an important difference between circumstances" where "the taxability issue had already been resolved, and the circumstances here, where the taxability issue remains disputed" before finding the open dispute precluded the nontaxpayer suit].) On the second point, the cited case, *Andal*, specifically noted it was "undisputed that plaintiffs are paying the challenged fee" and that "since the administrative refund process is inadequate to address [their] constitutional challenge, plaintiffs may maintain their declaratory relief action."

authority to impose the alleged tax, success would prevent collection of the tax, and the taxpayer has yet to pay despite satisfying the criteria for owing by extracting groundwater from a probationary basin. Nothing about this case indicates the Farm Bureau is exempt from the pay first rule. The adjudication of any declaratory relief claim "will bind the [state] as it seeks to collect the unpaid assessment," and an alternative procedure exists. (*Department of Tax & Fee Administration, supra*, 48 Cal.App.5th at p. 937.)

The Farm Bureau next relies on the narrower workaround disclosed in *Mojave Pistachios* for litigants subject to a statute of limitations that terminates before the tax is due. In *Mojave Pistachios*, the court included a footnote rejecting the assertion that section 10726.6, subdivision (c)'s statute of limitations created a prepayment remedy. (*Mojave Pistachios, supra*, 99 Cal.App.5th at p. 632, fn. 20.) In analyzing the statutory scheme in light of the pay first rule, the court noted that if a party extracted water and owed a fee before the filing deadline, they would be required to pay before filing suit. The court determined, though, that if no extraction occurred and thus no fee was owed, the party would still have to file by the deadline. If they subsequently came to owe a fee, the court stated the party would need to pay that fee "once incurred, in order to continue *maintaining* the action." (*Ibid.*) From this, the Farm Bureau contends one is permitted to file a lawsuit in order to meet the statute of limitations on a claim and thereafter pay any accrued fees in order to maintain the case.

To the extent the discussion in *Mojave Pistachios* constitutes a valid workaround to the pay first rule, its scope is extremely limited. One must not have incurred a liability under the alleged tax scheme and yet be at risk of forfeiting any challenge based on an applicable statute of limitations. Here, the Farm Bureau contends it is subject to a 30-day statute of limitations under section 1126 that began running on or about March 19,

---

(*Andal v. City of Stockton, supra*, 137 Cal.App.4th at p. 90.) *Andal* does not expressly hold that future expected taxation is exempt from the pay first rule.

April 16, or April 17, 2024, but would not owe any fees until at least April 1, 2025. Conversely, the State Board argues there is no applicable statute of limitations on the fee determination and the trial court conflated its fee determination with its probationary designation when determining a limitation period did exist. While we agree with the State Board's contention that the pay first rule bars this action, we find the statutory scheme more convoluted than the State Board suggests. As the statutory scheme may also affect the Farm Bureau's writ claims, we work through the many applicable statutes.

The probationary designation under section 10735.2, subdivision (a)(3) is authorized when "the department, in consultation with the [State Board], determines that a groundwater [plan] is inadequate or that the groundwater sustainability program is not being implemented in a manner that will likely achieve the sustainability goal." The designation triggers multiple events including, relevant to this discussion, the groundwater reporting requirements contained in part 5.2, beginning with section 5200 of the Water Code.

Under section 5202, subdivision (a)(1), these reporting requirements apply to "a person who" extracts "groundwater from a probationary basin 90 days or more after the [State Board] designates the basin as probationary pursuant to Section 10735.2" Such persons, unless excluded under section 5202, subdivision (c), must "file a report of groundwater extraction by February 1 of each year for extractions made in the preceding water year," and each report "shall be accompanied by the fee imposed pursuant to Section 1529.5."[12]  (§ 5202, subds. (b), (f).)

The fees authorized under section 1529.5 are themselves adopted "pursuant to Section 1530 to recover costs incurred in administering Chapter 11 (commencing with Section 11735)." (§ 1529.5, subd. (a).) As noted, these fees are expressly designed to be

---

[12]    These reports must also include, among other things, "[m]onthly records of groundwater extractions" made "by a methodology, water-measuring device, or combination thereof satisfactory to the [State Board]."  (§ 5203, subd. (e).)

imposed consistent with California's constitutional requirements in article XIII A. (§ 1529.5, subd. (c).) For its part, section 1530 states that the State Board "shall adopt, by emergency regulation, the schedules of fees authorized" in line with Government Code section 11340 et al., and essentially immunizes the decision from APA requirements. (§ 1530, subds. (a), (b).)

Under section 1536, annual fees, such as those imposed under sections 5202 and 1529.5, are paid to the Board of Equalization. Under section 1537, the Board of Equalization is required to collect these fees in line with the rules set forth in Revenue and Taxation Code section 55001 et seq., subject to two exceptions. (§ 1537, subd. (b).) First, "[n]otwithstanding the appeal provisions" in the Revenue and Taxation Code, "a determination by the [State Board] that a person or entity is required to pay a fee, or a determination by the [State Board] regarding the amount of that fee" is reviewed under the Water Code, part 1, chapter 4, starting with section 1120. (§ 1537, subd. (b)(2).) Second, "[n]otwithstanding the refund provisions" in the Revenue and Taxation Code, the Board of Equalization may not accept "any claim for refund that is based on the assertion that a determination by the [State Board] improperly or erroneously calculated the amount of a fee, or incorrectly determined that the person or entity is subject to the fee, unless that determination has been set aside by the [State Board] or a court reviewing the determination of the [State Board]." (§ 1537, subd. (b)(3).)

Notably, there are no specifically named "appeal" provisions in the Revenue and Taxation Code, although there are "redetermination" provisions. Under these provisions, one may petition for a redetermination within 30 days of notice of a determination. (Rev. & Tax. Code, § 55081.) The refund process under the Revenue and Taxation Code generally permits one to seek a refund for "any amount of the fee, penalty, or interest [that] has been paid more than once or has been erroneously or illegally collected or computed" within three years of the due date of the payment. (Rev. & Tax. Code, §§ 55221, 55222.) A separate lawsuit is typically barred unless a refund claim was filed

and then must be filed within 90 days from the refund claim denial. (Rev. & Tax. Code, §§ 55242, 55243.)

For its part, the Water Code provides review procedures for "any decision or order issued under" sections 1529.5, 1530, and 11735 et seq., among others. (§ 1120.) Section 1126, subdivision (a) then makes clear that it "is the intent of the Legislature that all issues relating to state water law decided by the [State Board] be reviewed in state courts, if a party seeks judicial review." To meet this goal, any "party aggrieved by any decision or order may, not later than 30 days from the date of final action by the [State Board], file a petition for a writ of mandate for review of the decision or order." (§ 1126, subd. (b).) Despite this broad invitation to seek review, if "no aggrieved party petitions for a writ of mandate within the time provided … the decision or order of the [State Board] is not subject to review by any court." (§ 1126, subd. (d).)

To simplify this morass of authorities, references, exceptions, and requirements in the context of this case, we note that challenges to State Board decisions made under section 1529.5, 1530, or 10735.2, as are alleged in this case, must be made by a writ of mandate and filed within 30 days of the State Board's final action. If a writ of mandate is not filed, the statute bars legal challenges to the State Board's decision. Despite this bar, if a fee imposed under these statutes is alleged to be illegally collected, there is a possibility that it can be challenged through a refund proceeding before the Board of Equalization within three years of the fee becoming due.[13] Under such a scenario, a lawsuit may be permitted, but only if the pay first rule is met. However, should this later challenge allege that the State Board improperly or erroneously calculated the amount of

---

[13]    This court need not resolve and takes no position on the scope of the potential difference between challenges claiming the State Board "improperly or erroneously calculated the amount of a fee" (which are subject to §§ 1120–1537, subd. (b)(3)) and challenges claiming a fee "has been erroneously or illegally collected or computed" (which are subject to a refund proceeding under Rev. & Tax. Code, § 55221, subd. (a)). We only note the possibility of such a suit given the difference in language.

a fee, or incorrectly determined that the person or entity is subject to the fee, then the refund proceeding and subsequent lawsuit will be blocked unless the challenged action has previously been found improper through the required writ proceedings.

We now return to the seventh cause of action, which seeks a declaratory judgment that a State Board decision (purportedly the probationary designation but ultimately the amount of the fees adopted previously but triggered by that decision)[14] imposed an illegal tax. To the extent the Farm Bureau relies on the 30-day statute of limitations from section 1126, that statute would not support the *Mojave Pistachios* workaround because the seventh cause of action does not utilize the statutorily required writ of mandate. To the extent the Farm Bureau can validly contend the fees imposed are illegally collected as an improper tax, that claim is subject to the pay first rule and the statutorily required refund proceedings. In either case, the seventh cause of action does not qualify for an exemption to the pay first rule.

Ultimately, then, the trial court erred by overruling the State Board's demurrer to the seventh cause of action. The pay first rule attaches to the claim asserted, and no exception to the rule applies.

### There is no basis to amend.

Finally, the Farm Bureau contends it should be granted leave to amend "to allege compliance with the pay first rule to maintain the action." We do not agree. As detailed above, there is no path by which the Farm Bureau can bring a declaratory relief action challenging the fees imposed by the State Board's actions under a tax theory without first being assessed and paying those fees. The Farm Bureau has provided no alleged facts under which it could amend to state a valid claim. For that reason, the seventh cause of action cannot be amended to state a valid cause of action. (See *Galbiso v. Orosi Public*

---

**14** The Farm Bureau contends it is challenging "the fee as applied through adoption of the probationary designation" and not "adoption of the Probationary Fee Regulation," which is the subject of a different claim.

40.

*Utility Dist.* (2010) 182 Cal.App.4th 652, 674 [leave to amend is proper where there is a reasonable possibility the plaintiff can cure the defects, but the plaintiff must demonstrate how the complaint can be amended].)

### *The Ninth Cause of Action—Declaratory Relief*

Appellant's ninth cause of action requests declaratory relief under Code of Civil Procedure, section 1060 on the ground an "actual controversy exists surrounding the legality of the Probationary Designation." The State Board argues a declaratory relief action is improper where the Legislature has provided an adequate remedy in the form of a mandamus action. The Farm Bureau disagrees, arguing both avenues can proceed, provided the declaratory relief action would not interfere with a discretionary act of the legislative process. For the reasons set forth below, we agree with the State Board—declaratory relief is unavailable given the legislative decision to provide a mandamus action.

*Applicable Law*

"It is settled that an action for declaratory relief is not appropriate to review an administrative decision." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 249.) "When a remedy has been designated by the Legislature to review an administrative action, declaratory relief is unavailable." (*County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 1002.)

Under section 1126, subdivision (b), any "party aggrieved by any decision or order may, not later than 30 days from the date of final action by the [State Board], file a petition for a writ of mandate for review of the decision or order." Section 1126, subdivision (c) provides: "Section 1094.5 of the Code of Civil Procedure shall govern judicial proceedings under this section." And section 1126, subdivision (d) explains: "If no aggrieved party petitions for a writ of mandate within the time provided by this section, the decision or order of the [State Board] is not subject to review by any court."

41.

*Analysis*

The overall statutory scheme covering administrative decisions made by the State Board clearly contemplates relief through writ of mandate proceedings. And the provisions go so far as to bar review of decisions when no writ has been timely filed. Under well settled law, then, declaratory relief is unavailable where "as here, the Legislature has designated a remedy by which to review an administrative action." (*Phelps v. State Water Resources Control Bd.* (2007) 157 Cal.App.4th 89, 105.)

## **Conclusion**

The trial court erred as a matter of law when it overruled the State Board's demurrer with respect to the sixth, seventh, and ninth causes of action. The trial court's determination with respect to the third cause of action has not been challenged.

### DISPOSITION

Let a writ of mandate issue ordering the trial court to vacate its order overruling the demurrer and enter an order granting the demurrer without leave to amend as to the sixth, seventh, and ninth causes of action. The trial court's determination with respect to the third cause of action will not be affected.

Costs are awarded to the State Board.

HILL, P. J.

WE CONCUR:


DETJEN, J.


FAIN, J.*

---

\* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

42.